Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 52,922-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MICHAEL ABRAMS                                    Plaintiff-Appellee

versus

BRITTANY TURNER                                   Defendant-Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2017-2618 (Civil)

Honorable Alvin R. Sharp, Judge

* * * * *

FAMILY JUSTICE CENTER                             Counsel for Appellant
By: Sophia Dixon Brown

MICHAEL ABRAMS                                    In Proper Person

* * * * *

Before WILLIAMS, MOORE, and COX, JJ.

**MOORE, J.**

Brittany Turner, a single mother residing in New Orleans, appeals a judgment that awarded her and her former partner joint custody of their two boys; however, the court named the father, Michael Abrams, who resides in Monroe, the domiciliary parent with primary custody of the boys during the school year. Ms. Turner alleges that the trial court clearly abused its discretion and argues that the weight of the evidence favored making her the domiciliary parent under La. C.C. art. 134.

For the following reasons, we affirm the trial court judgment.

## PROCEDURAL HISTORY

Michael Abrams filed a petition against Brittany Turner for sole custody of their two minor male children, Jayden and Amir, ages 10 and 5 years, respectively, alleging that Brittany had abandoned the children by dropping them off at her father's house in Shreveport and did not return to get them. Brittany answered denying that she abandoned her children, and filed a reconventional demand seeking sole custody of them on grounds that they have lived most of their lives with her with very little assistance from Michael.

A Hearing Officer Conference ("HOC") was held on October 16, 2017, after which the hearing officer filed a report recommending that both parents share joint custody of the two children, but that Michael be designated the domiciliary parent. Brittany objected to the HOC report and its recommendations, and requested a trial on the matter. Pending trial, the court temporarily adopted the HOC joint custody implementation plan

giving Michael primary custody and Brittany biweekly visitation. However, she did not exercise her visitation the seven months prior to trial.[1]

At trial of the matter, July 9-11, 2018, both parents and two witnesses testified, and the court kept the record open until it held a *Watermeir* inquiry with the oldest child, Jayden, who by then was 11 years old. There was no interview with the younger boy, six-year-old Amir.

On August 14, 2018, the court filed a judgment finding that of the factors listed in La. C.C. art. 134, factors (1), (6), (7), (10) and (11) were equal, but factors (2), (3), (4), (5), (8) and (9) weighed in favor of the father, and factor (12) favored the mother. Based in part on these findings, it awarded the parents joint custody of the children and named Michael, who lives in Monroe, the domiciliary parent, subject to reasonable visitation for Brittany. Michael was ordered to submit a visitation plan within 15 days. Neither party appeared at a subsequent hearing, set for September 14, 2018; correspondence in the record indicates that neither Michael nor Brittany's counsel received the judgment allegedly mailed on August 15, 2018. Michael notified the clerk's office on August 17, 2018, two days after the judgment was mailed, of a change of address and counsel notified the clerk's office that it did not receive the judgment. Subsequently, Michael submitted a proposed visitation plan on September 10, 2018, that lacked a determinate visitation schedule.

This appeal followed.

---

[1] The trial court questioned Brittany as to why she had not seen or visited the children during that period. She told the court that she did not have the means to visit the children although she kept in touch with them by telephone.

2

**FACTS**

Brittany Turner and Michael Abrams began dating in the fall of 2006, while she was living and working as a medical coder in Houston, Texas. Although she is from New Orleans, Brittany moved to Houston in the aftermath of Hurricane Katrina. Michael works as a barber and instructor at Delta Community College in Monroe.

Two children were born from the relationship. The first, Jayden, now age 12, was born on August 16, 2007, in Houston; the second, Amir, was born on November 13, 2012, in Monroe, and is now 6.

Michael testified that Brittany called him in Monroe when the baby was six months old and told him he was the father.[2] He said he immediately went to Houston, accepted that he was the father, and began giving financial support to Brittany. Eventually Michael adopted the child and the boy's name was changed to Jayden Michael Abrams. For the next year and a half, the long-distance relationship continued with Brittany in Houston and Michael in Monroe.

Brittany moved to Monroe in 2009 when Jayden was two years old. By 2011, the couple moved in together. She testified that she and Michael lived together a total of three years over the entirety of their relationship – from 2011 to 2013, and the year of 2016. She testified that Michael did not provide her with consistent support, and particularly he gave no financial support – only contributions of clothing and shoes and other items for the children.

_____

[2] A DNA paternity test showed that another man who she thought was the father was not the father.

By contrast, Michael testified that between 2009 and 2014, when Brittany moved back to Houston, they lived together most of the time, but they occasionally split up temporarily over disagreements. He estimated they lived together four years out of that five-year period. He testified that he gave Brittany financial support.

Brittany's main complaints regarding the rocky relationship with Michael were lack of financial support and Michael's very controlling and overbearing character. She said he would treat her kindly or help her financially only when she followed his rules. Toward the end of their relationship, she said that he harassed her at work with telephone calls belittling her and restricting her to her apartment. She said he referred to her as a "clown."

Michael admitted that he has a lot of rules when he answered the court's questions regarding why he thought it would be advantageous for Jayden to live with him rather than Brittany. Contrary to Brittany's testimony, he said that when they lived together in Monroe, he paid the larger monthly bills and she paid the smaller bills.

In 2014, Brittany went back to Houston, ostensibly to interview for a job at a medical billing facility. She testified that she and Michael discussed the job and interview before she left. Conversely, Michael testified that there was no discussion; he woke up and she was gone, leaving only a note on her pillow with an ultimatum that either they take the next step and get married or, presumably, it was over between them. She did not take the children with her.

After a few weeks, she came back to Monroe to get Jayden, but left Amir with Michael. Both parents decided that Amir should stay in Monroe

because he was so young.  She also testified that for the next year and a half, she drove to Monroe once or twice a month.  Once for a two-week period she kept Amir with her in Houston.  She said that Michael drove to Houston to see the children only "about two times."  Michael agreed that Brittany did most of the driving between Houston and Monroe, but he said that he had Amir with him almost the entire time except for the two-week visit in which he let her take Amir back with her.  He confirmed that he and Brittany agreed that they would separate the kids during that period.

Early in 2016, Brittany apparently became unemployed and returned to Monroe.  By this time, Michael was in a new relationship with another woman.  Apparently both children lived with Brittany at this time, and she came to Monroe without the means to get a place of her own.  They moved into the home of a friend from the church she attended.  This arrangement was short-lived for unspecified reasons.  From there, she moved with the children into the home of another friend from the church.  Finally, on June 1, 2016, Michael signed a lease for a duplex apartment for her, but he testified that Brittany paid the deposit.  There is disputed testimony as to how much he assisted her with the rent or whether she paid it all herself.  She testified that he helped her with the rent for two months, while he testified he helped her for four or five months and said he had checks to prove it.

Even with this arrangement, their troubles continued.  Brittany testified that during the one-year period from June of 2016 to June of 2017, when she moved out of the apartment, Michael came and went from the apartment unannounced, letting himself in while she was gone even though he did not live there.  She said that he became controlling and tracked her

5

location through her cell phone. He did not approve of her going anywhere but to work.

During this same time period, Michael lived with his girlfriend after the house he rented was destroyed by flood in 2016. At trial, he recounted several incidents in which Brittany would come to his girlfriend's house and blow the horn continuously until he came out of the house to speak with her. They argued and she got angry and attacked him physically by punching him or throwing objects at him.

On July 1, 2017, Michael received a phone call from Brittany's father either requesting or offering him to come and get the children in Shreveport. Michael testified her father told him that a few weeks earlier Brittany had left the children with him, and he had been unable to get in touch with her and did not know her whereabouts. Michael picked up the children that day and kept them until trial.

Brittany testified that her father called Michael because he needed to go out of town due to the imminent death of his wife's brother; her father knew Michael had not seen the kids in a while, and he offered Michael a chance to see them because they were bored.

The children remained in Michael's custody for about two weeks when Brittany returned and attempted to take them from a day camp they were attending in Monroe called Camp Jopah. Jayden attended the camp the previous year and enjoyed it, so Michael enrolled both boys in the camp. Near the last day of camp, Michael became suspicious when Brittany's mother called him and wanted to get the boys. Michael refused her request because they were at camp and he had actually seen them very little himself. He spoke to the director of the camp and asked her to call him if anyone,

including Brittany, came to pick up the kids. That day Brittany showed up at the camp to pick them up and take them with her. The director at the camp would not surrender them to her and called Michael. He immediately went to the camp and a verbal dispute occurred between Brittany and Michael in the facility parking lot in which Michael refused to let Brittany take the kids.

Shortly thereafter, Michael filed a petition for sole custody of the children. After the HOC hearing, the children apparently remained in Michael's custody until trial on July 9, 2018.

Although both parents petitioned for sole custody, Brittany admitted at trial that she wanted joint custody and financial help. Her primary complaint on appeal is that the court below named Michael the domiciliary parent whereby the children would live primarily with him in Monroe and attend school there while she lives in New Orleans.

**DISCUSSION**

The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; *Evans v. Lungrin*, 1997-0541 (La. 2/6/98), 708 So. 2d 731. This determination requires a weighing and balancing of factors favoring or opposing custody in respective competing parents on the basis of evidence presented in each particular case. *Hoskins v. Hoskins*, 36,031 (La. App. 2 Cir. 4/5/02), 814 So. 2d 773.

The non-exclusive list of relevant factors to be considered in determining the best interest of the child found in La. C.C. art. 134 are:

(1) The love, affection, and other emotional ties between each party and the child.

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6) The moral fitness of each party, insofar as it affects the welfare of the child.

(7) The mental and physical health of each party.

(8) The home, school, and community history of the child.

(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11) The distance between the respective residences of the parties.

(12) The responsibility for the care and rearing of the child previously exercised by each party.

While the court is not bound to make a mechanical evaluation of all the statutory factors listed in La. C.C. art. 134, it should decide each case on its own facts in light of those factors. Nor is the court bound to give more weight to one factor over another; rather, when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. *Hoskins v. Hoskins, supra.* The factors are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. *McIntosh v. McIntosh*, 33,908 (La. App. 2 Cir. 8/31/00), 768 So. 2d 219.

The trial court's finding that joint custody is in the best interest of the child does not necessarily require an equal sharing of physical custody. *Collins v. Collins*, 36,629 (La. App. 2 Cir. 10/23/02), 830 So. 2d 448. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. *Jones v. Jones*, 38,790 (La. App. 2 Cir. 6/25/04), 877 So. 2d 1061.

The trial court has great discretion in child custody cases based on its opportunity to better evaluate the credibility of witnesses. Accordingly, the trial court's determination of custody issues is afforded great weight and will not be disturbed on appeal absent an abuse of discretion. *Hoskins v. Hoskins, supra*.

This appeal concerns the question of which parent desiring primary custody of the two boys did the testimony and evidence favor at trial. By her first assignment of error, Brittany argues that the court abused its discretion by giving undue weight and credibility to Michael's testimony. His testimony was not credible, she argues, because at trial he contradicted the allegations in his petition, namely that she abandoned the children without clothing, shoes and essentials. However, at trial, he admitted that the children were indeed clothed and shoed when he picked them up from their grandfather's house in Shreveport. They were not abandoned, Brittany maintains, because she left them with their grandfather and she intended to return and pick them up. Michael acknowledged at trial that the children were with their grandfather, and they were not left unattended on an empty street.

Her testimony should be given more weight, Brittany argues, because it was corroborated by the testimony of her mother and her cousin. By

contrast, Michael did not have any witnesses to corroborate his "self-serving" testimony. Since her witnesses observed the kind of parent Michael was during his visits to see her and the children, she maintains that where there are contradictions between her testimony and Michael's testimony, the court should give greater weight to her testimony in view of Michael's lack of credibility.

In child custody cases where two parents are fervently competing for custody and domiciliary status of the children, frequently the trial court must determine the best interest of the children solely from the testimony of the parents and their respective relatives or friends. This naturally passionate and self-interested testimony is rarely objective, leaving it to the trial court, who is in the best position to view firsthand the demeanor and tone of the witnesses, to assess the credibility of the witnesses and decide how much weight to give the testimony in light of the factors of La. C.C. art. 134. Hence, as we have stated above, a trial court has great discretion in child custody cases based on its opportunity to better evaluate the credibility of witnesses, *McCready v. McCready*, 41,026 (La. App. 2 Cir. 3/8/06), 924 So. 2d 471, and the relative weight given to each factor. *McIntosh v. McIntosh*, *supra*.

The semantic dispute over whether leaving the children with their grandfather for an extended period of time constituted abandonment is of little moment. What is important, however, are the facts and reasons why Brittany left the children with her father for such a considerable period of time. At trial, Brittany said that she was fleeing Monroe because of stress and issues she had with Michael, and she was feeling a lot of pressure. She explained, "My plan was to bring the children to my father, go and get

10

myself seen by a doctor and then go back to work." She initially planned to live with her father, and eventually get housing of her own and some assistance.[3] She ended up in Paris, Texas, because her mother's sister told her she could easily get work there. She said that when she left the children with her father, they were adequately clothed and shoed, and they had personal hygiene products. She needed to obtain medical care and housing independent from Michael. Further, while her father knew the situation with Michael, she did not tell him that Michael could not see the children. Subsequently, when her father needed to leave the state because of a death in his wife's family, he called Michael to come and get the kids.

Michael's account is somewhat different. He testified that after Brittany found out that he was engaged, she essentially cut him off from any communications with her or the children; she would not answer his phone calls or texts so that he could speak with or see the kids. She had moved out of the apartment for which he signed the lease; however, the landlord did not require him to pay the remainder of the term of the lease.

He had not seen the boys for three months when, on July 1, 2017, he got a phone call from Brittany's father telling him that he had been trying to contact Brittany for a while, could not get a response, did not know where she was or what was going on, but he knew that Michael had been trying to get in touch with her. He told Michael that the boys had been with him for a few weeks; he had been unable to get in touch with Brittany, and the boys were just sitting around. He offered for Michael to come and pick up the boys. He never told him that he needed to take his wife out of state.

---

[3] Some time prior to this incident, she had initiated an action for child support against Michael, but missed her hearing.

While Michael's use of the term "abandoned" in his petition might be considered an overstatement, he does clearly state the facts on which his allegation was based, namely, that Brittany left the children with their grandfather and never returned. Further, his allegation that Brittany left the children with "no clothes, shoes, or any of the basic essentials" is an exaggeration; apparently, they were dressed, but there is no real evidence whether they were left with several changes of clothes needed for an extended stay. Michael testified that the clothes the children had were too small for them. Although Brittany testified that she intended to return, she did not say when she planned on returning, and there is no testimony that she told her father or Michael when she planned on returning.

We conclude that the differences between Michael's allegations in the petition and the facts that surfaced at trial are not so great as to render his testimony any less credible. His allegations simply reflect the highly subjective, adversarial point of view expressed by most parents who are competing for custody of their children when characterizing each other's actions and motivations.

We therefore find that the record does not support Brittany's claim that the trial court abused its discretion by giving undue weight and credibility to Michael's testimony. This assignment is without merit.

By her second assignment of error, Brittany argues that the trial court abused its discretion by failing to consider the manifest weight of evidence favoring her. Essentially, she argues that several of the factors that the court either found favored Michael, or were evenly favorable, actually favored her.

The trial court stated its conclusions regarding the factors of La. C.C. art. 134. It found factor (1) to be even, that is, that both parents have love, affection and emotional ties to the children.

The trial court found that factors (2), (3), (4), (5) and (8) slightly favored Michael. Brittany contests this conclusion with regard to each of these factors.

In factor (2) the court considers the capacity and disposition of each party to give the children love, affection, and spiritual guidance and to continue their education and rearing. Brittany contends that there was no testimony that she lacked the capacity or disposition to give her children love and affection or continue their education and rearing. She points to testimony by her witness Shelita Turner that she attended church even when she visited them in New Orleans, but Michael did not attend church with them.

At trial, Michael expressed his firm religious beliefs and cited his creation of a nonprofit enterprise devoted to community service which, he said, provided spiritual guidance to children. While in a conventional sense, this factor might favor Brittany, we cannot say that the trial court abused its discretion in finding that it slightly favored Michael.

Factor (3) concerns the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs. Brittany argues that she worked throughout to provide for the children, and that she provided their health insurance, took them to the doctor, and had them immunized despite Michael's opposition to immunization. In her testimony, Brittany said that Michael provided financial support only from

13

time to time and that his support generally consisted of providing clothes for the children.

Our review of the record confirms that the children had medical insurance on a plan obtained by Brittany. Michael confirmed at trial that he was opposed to immunization. As far as employment, Michael is a barber and instructor at Delta Community College and appears to have been employed continuously. He also maintains that he provided Brittany with financial support when they were together.

Regarding Brittany's employment, the record is somewhat nebulous. She was working as a medical coder when they met, but she left that job at some point. There were obviously periods of unemployment when she went to Monroe and did not have the means to obtain a place to live, and when she left Monroe in 2017, dropped the kids off with her father, and said she went to Paris, Texas, to look for a job. She told the court that her license to do medical coding had lapsed and she planned to get it reinstated.

This testimony indicates that both parties have certain capacities and dispositions toward providing for the children; however, Michael appears to have, for the time being, a more stable capacity to provide for their housing and material needs. Accordingly, we find no abuse of discretion in the court's conclusion that this factor slightly favored Michael.

Brittany argues that factors (4), (5) and (8) overwhelmingly weighed in her favor. These factors concern the length of time the child has lived in a stable, adequate environment, and the desirability to maintain that environment; the permanence of the existing or proposed custodial home or homes; and, the home, school and community history of the child.

We find no abuse of discretion in the court's finding that the weight of the evidence slightly favored Michael in these factors. Brittany has moved from Houston to Monroe and back at least two times, and after leaving the children in Shreveport with her father, now lives in New Orleans in a duplex owned by a relative. Although Michael has moved at least twice in the city of Monroe, he is now married and living in a purchased home there. During most of Brittany's moves without Michael, she has had custody of Jayden, and she had custody of Amir much of that time. Except for the second move to Monroe, there is no evidence that the children were not well taken care of in a stable environment. In recent years, the children have attended school in Monroe and continue to attend school there.

Although we have no doubt that both Brittany and Michael can satisfy these factors, the record supports the trial court's conclusions.

Factor (9) concerns the reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference. Brittany argues that her cousin, Shelita Turner, revealed that Jayden was distraught over not being with his mother. The trial court interviewed Jayden pursuant to a *Watermeir* interview. The judgment does not state that Jayden stated his custody preference. Michael discussed, at some length, Jayden's school work and extracurricular activities. At trial, each parent gave reasons why he or she thought the children would be better off in his or her custody. Based on this record, we cannot say that the trial court abused its discretion in finding the weight of the evidence slightly favored Michael.

Finally, Brittany argues that although the trial court found that the evidence regarding factors (6) and (10) weighed equally, they should have favored her.

15

Factor (6) concerns the moral fitness of each party insofar as it affects the welfare of the child.  After review, we conclude that the trial court was correct in its conclusion that the evidence weighed equally in favor of each party.  Brittany claims that Michael became involved with a married woman whom he later married and that Jayden told her that she did not care (e.g., prepare meals) for them.  Michael asserted at trial the Brittany was involved with her trainer, who was allegedly a convicted felon and bisexual.  However, there was no reliable evidence of moral turpitude regarding either parent.  In fact, quite the opposite was shown.

The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the children and the other parent is factor (10).  Brittany notes that she made great efforts to encourage the relationship between the children and Michael, making most of the trips from Houston to Monroe so that Michael could see the kids.  Michael's own testimony supports this contention.  Up to this time, the evidence favored Brittany under this factor.

However, when Brittany left Monroe in 2017, Michael testified that she would not answer the phone to make arrangements for him to see the boys.  He was unable to speak to or see them for three months until Brittany's father called and offered to let him come get them.  There is no evidence that Michael prohibited Brittany from seeing the children during the seven months after he picked them up until trial; nor is there evidence that he actively encouraged or aided Brittany to see the children.

Based on this record, we conclude that once the custody dispute arose, neither parent actively encouraged a relationship between the children and

16

the other parent.  Accordingly, we find no abuse of discretion as both parents were equally remiss under this factor.

This assignment is without merit.

The record before us indicates that both parties missed a scheduled hearing regarding a joint custody implementation plan and visitation schedule.  The record also contains an incomplete or indeterminate visitation schedule submitted by Michael.  For this reason, we will remand the case to the trial court for further proceedings in this regard.

## CONCLUSION

We conclude that the trial court did not abuse its discretion by awarding Brittany and Michael joint custody and by naming Michael domiciliary parent.  Because Brittany lives in New Orleans, equal sharing of physical custody is not feasible; however, to the greatest extent possible, any visitation plan should afford Brittany determinate, frequent, and regular visitation periods.  Accordingly, we remand this matter to the trial court to set a visitation schedule for Michael and Brittany.

For the foregoing reasons, we affirm the judgment awarding joint custody to each parent and remand with instructions regarding a visitation schedule.  Appellate costs are to be paid by Brittany Turner.

**JUDGMENT AFFIRMED; REMANDED WITH INSTRUCTIONS**.